**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**VIRA J. HYDE,**

    **Plaintiff,**

v.                                              Case No.  8:07-cv-240-T-30MAP

**STORELINK RETAIL GROUP, INC.,**

    **Defendant.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. 37), and Plaintiff's Memorandum of Law in opposition to the same (Dkt. 53).  The Court, having reviewed the pleadings and documents filed in support, having heard oral argument from the parties, and being otherwise fully advised in the premises, determines the Motion should be denied.

### Background

In or about April of 1996, Plaintiff Vira Hyde ("Hyde") was employed as a Service Representative with Southeast Associates ("Southeast").  Southeast maintained service agreements with product managers who sold their products in Home Depot Stores.  In 2002, Hyde was promoted to a District Manager position.  In August of 2004, Southeast Associates merged with a competitor company to form Defendant StoreLink Retail Group, Inc. ("StoreLink" or "Defendant").

Following the merger, the structure and nature of both predecessor businesses changed. Rather than work for product manufacturers, StoreLink contracted directly with The Home Depot for responsibility over the paint and hardware departments of each Home Depot Store. As such, employees who were previously accountable to a limited number of manufacturers for a small number of products became responsible for entire departments containing thousands of products. Moreover, Home Depot exerted greater control over StoreLink employees than it had over the predecessor companies.

A number of StoreLink employees, including Hyde, were dissatisfied with the new business model. Two owners of the new company have testified Plaintiff demonstrated a negative attitude at a "kickoff" training seminar following the merger. In November of 2004, Plaintiff's husband, who was employed by StoreLink as a Regional Manager (and Hyde's supervisor), resigned from his position. Plaintiff was promoted to Regional Manager to replace her husband. As a Regional Manager, she was responsible for supervising District Managers who in turn work with and supervise Sales Representatives. Initially there were two Regional Managers in Florida. Hyde worked as the Regional Manager for Hardware Departments, while Steve Jaspan was the Regional Manager for Paint Departments.

In early 2005, Jaspan began a consensual sexual relationship with a subordinate employee, Andrea Vittitoe. Jaspan disclosed the relationship to Michael Murphy, StoreLink's Vice President of Operations. In or around April of 2005, Vittitoe was transferred to another department outside of Jaspan's chain of command. Following the transfer, Vittitoe reported to District Manager Tom Mill, who in turn reported to Hyde.

In August of 2005, StoreLink reorganized its management structure. Rather than assign employees to a particular department (i.e., paint or hardware), the company divided Florida into three regions. Plaintiff was assigned an area that included Orlando, Jacksonville, and Gainesville. Donnie Colbeth and Bill Troy, formerly District Managers working under Jaspan, were assigned the other two Florida regions. Jaspan was promoted to Director of Operations, and as such became the direct supervisor of the Regional Managers, including Hyde. At the time, Plaintiff was the only female Regional Manager, not only in Florida but throughout the entire company.

StoreLink announced the reorganization, including Jaspan's promotion, at a supervisor meeting held in Atlanta, Georgia. Murphy claims Hyde became visibly upset when the promotions were announced. Further, Murphy claims he had to pull Hyde aside after the meeting to explain the necessity of the changes and the purpose of the realignment. Hyde claims she was concerned that none of her District Managers had received a promotion.

Jaspan claims that following his promotion over Hyde, she resisted his instructions and argued with policies. Furthermore, Jaspan claims Hyde failed to respond to his telephone calls and emails in a timely manner. On at least one occasion, Murphy warned Hyde that she needed to improve her communication with Jaspan. Hyde claims the first time she heard a complaint about her cell phone unavailability was at Jaspan's deposition in this case, and argues it was common knowledge that cell phone reception was poor in some stores and non-existent in others.

Defendant argues Hyde regularly demonstrated a negative attitude in management conference calls. A few of the owners have testified that Hyde demonstrated such an attitude by questioning their decisions and disagreeing with the instructions given her. Jim Ward, then one of the owners of StoreLink, testified that the owners discussed taking disciplinary action against Hyde for her attitude problems as early as March or April of 2005. Ward claims that, based on his long-time friendship and working relationship with Hyde, he encouraged the other owners to give her additional time to adjust.

In October of 2005, StoreLink conducted a product training seminar at a Holiday Inn in Altamonte Springs, Florida. According to Hyde, Mill contacted her approximately one month prior to the seminar. Mill informed her of complaints he had received from Vittitoe regarding Jaspan. Vittitoe claimed she had broken up with Jaspan, but that Jaspan continued to follow her around and was essentially "stalking" her. Mill told Hyde that Vittitoe was worried about what might happen at the upcoming conference. Hyde did not discuss the matter with Vittitoe, but claims she did discuss the matter with her superior, Rob DeVivo, and Human Relations Director Tiffany Childress.

On the last night of the seminar, an incident occurred between Jaspan, Vittitoe, and a Bosch Power Tools' representative named Andy Carney. While walking by Vittitoe's hotel room, Jaspan observed Vittitoe and Carney alone in the room through a window. According to Mill, Vittitoe later complained that Jaspan had kicked open the door and began to scream and make accusations at Vittitoe and Carney. Jaspan purportedly threatened Carney and warned him to stay away from Vittitoe. Vittitoe reported the incident to Mill later that

evening. Carney was present during the conversation and affirmed Vittitoe's statements to Mill.[1]

Mill testified that he spoke with Jaspan the following morning. Jaspan explained that he was dating Vittitoe and that he had apologized to her later that evening. Believing that Jaspan's account of the events conflicted with Vittitoe's, Mill decided to report the incident. Because he believed his then Regional Manager, Colbeth, was good friends with Jaspan, Mill decided to first discuss the incident with Hyde. Hyde agreed Jaspan's conduct was out of control and should be reported.

Both parties agree that Mill submitted a written report of the incident to StoreLink's Human Relations ("HR") Director, Tiffany Childress.[2] Mill claims Childress contacted him by telephone after he submitted a statement regarding the events. Mill asserts that Childress asked him if he was under duress to submit the statement, and that she went on to minimize Jaspan's conduct.

The parties disagree about Hyde's role in reporting the incident. Hyde claims she spoke with her superior, DeVivo, following the incident, who instructed her to report it to HR. Hyde claims she also reported the incident via telephone to StoreLink owners Fred Berger and Ward, as well as HR Director Childress. Hyde claims she also prepared and e-

---

[1] According to Plaintiff, Vittitoe no longer works for StoreLink and her whereabouts are unknown. Accordingly, she has not provided any testimony in this action. However, Jaspan does not deny that the confrontation with Carney and Vittitoe occurred.

[2] Childress no longer works for Storelink. According to the parties, she could not be located for deposition and her whereabouts are unknown.

mailed a written statement to Childress. Defendant claims to have no record of Hyde's written report. Jaspan denies ever having knowledge that Hyde submitted a report or complained about the incident. Moreover, the StoreLink owners deny having knowledge of the written report Hyde claims she sent to Childress.

After conducting an investigation, Childress concluded no disciplinary action should be taken against Jaspan. During the investigation, Murphy and Childress interviewed Vittitoe. According to Murphy, Vittitoe stated Jaspan never harassed her and referred to Mill's statement as a "fabrication." Murphy claims he had no knowledge that Hyde had complained or had any role in the matter. Vittitoe voluntarily resigned from her position shortly after the investigation had concluded. Jaspan claims he and Vittitoe continued a dating relationship for approximately six months following her resignation.

Following the investigation of Jaspan, Hyde's relationships with Jaspan and upper management began to deteriorate. Hyde argues this was a direct result of her complaining about Jaspan's conduct. Defendant argues it was due to a Hyde's continued negative attitude accompanied by a decline in her work performance.

Whatever the reason, Hyde began to receive negative feedback shortly after the incident at the training seminar was reported. During a lunch meeting with Ward in mid-October of 2005, Ward told Hyde that the owners perceived her has having a negative attitude. He encouraged her to be more enthusiastic and supportive of the changes the company was going through. On or about December 21, 2005, Hyde received a written performance warning from Jaspan. The warning indicated that one of the stores in Hyde's

territory was not receiving adequate service due to a Service Representative leaving his job. Furthermore, the warning indicated that the store did not have a working computer and that Hyde had failed to correct a territory layout. Hyde attributed the problem to her District Manager, whom she claims was responsible for alerting her of the need for coverage. Moreover, she claims it was impossible to correct the territory layout because she had been ordered to Atlanta to cover another employee's responsibilities and reset a hardware department.

During 2005, Liberty Hardware ("Liberty") initiated a buy-back of its cabinet knobs and hinges from Home Depot. As a result, Home Depot required StoreLink to replace the old products on display with new ones. StoreLink was informed that executives from Home Depot and Liberty would be attending an International Builders Show in Orlando, Florida, in January of 2006. Approximately one month prior to the show, Jaspan advised Hyde of the upcoming event and instructed her to oversee the replacement of the Liberty displays in the Orlando stores.

Hyde claims the Liberty displays were supposed to be reset by a separate set crew rather than StoreLink's service group. In any event, the displays were not appropriately replaced in all stores. After inspecting the displays in the Orlando stores, Home Depot and Liberty executives complained to StoreLink's owners. StoreLink owner Jeff Burdick assured the executives that all displays would be properly replaced within two or three days, and promised that StoreLink would provide completed pictures for each store.

Jaspan divided the Orlando stores between himself and Hyde and the two went to work resetting the stores for the next Liberty walk-through. Jaspan claims Hyde lacked the sense of urgency he expected in meeting the Liberty deadline. Jaspan further claims to have visited a store the night before the deadline and discovered it had not been reset. Although he called Hyde to inform her of the situation, he claims Hyde failed to return his call. Jaspan and a District Manager worked through the night to reset the store by the required deadline.

On January 13, 2006, Jaspan issued Hyde another written performance warning for failing to show a sense of urgency responding to the Liberty Hardware issue and for failing to take "before" and "after" pictures of the resets. Hyde claims she worked diligently for long hours to respond to the Liberty Hardware situation in Orlando. Further, she claims Burke had previously instructed StoreLink employees at a seminar that "before" pictures were no longer required.

Hyde's stores were not the only ones in which the Liberty displays had not been properly reset. Murphy and Jaspan held conference calls with the District and Regional managers in a number of areas to address the situation. In March of 2006, Jaspan instructed Hyde to verify the Liberty displays in all Jacksonville stores had been appropriately replaced. Jaspan and Murphy testified that less than a week after Hyde had purportedly inspected the stores, the Jacksonville stores were inspected by Home Depot and Liberty executives. The executives found that five of Hyde's eleven Jacksonville stores had not been replaced.

As a result, Jaspan issued Hyde a third written warning on or about March 23, 2006. The owners discussed Hyde's performance and attitude the following week. Asserting

concerns over Hyde's continued negative attitude, effort, and poor work performance, the owners collectively decided to terminate Hyde's employment. The owners present at the meeting who made this decision were Fred Berger, Jim Ward, Tim Young, Jeff Burdick, and Bob Conrad.

Defendant claims Jaspan was not present at the meeting and did not participate in the decision to terminate her employment. Although Murphy was present at the meeting, Defendant claims he did not participate in the decision. Once the decision was made, Jaspan fired Hyde in the Brandon Home Depot Parking lot on March 26, 2006. Following her termination, Hyde was replaced by a male named Diego Ulao.

As a result of her termination, Hyde filed the instant action. Hyde's remaining claims include federal and state law claims for gender discrimination and retaliation under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000 *et seq.* ("Title VII"), and the Florida Civil Rights Act of 1992 ("FCRA").

## **Summary Judgment Standard**

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor. Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. Chelates, 477 U.S. at 324. The evidence must be significantly probative to support the claims. Anderson, 477 U.S. at 248-49. This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

**Discussion**

**I.    Gender Discrimination Claims**

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As recognized by Florida courts, the FCRA was patterned after Title VII and the ADEA. Brown Distributing Co. Of West Palm Beach v. Marcell, 890 So.2d 1227, 1230 (Fla. 4th DCA 2005). Federal case law interpreting Title VII and the ADEA is applicable to actions arising under the FCRA. Id. Accordingly, the Court applies the same analysis to Hyde's Title VII and FCRA claims.

Hyde has not presented any direct evidence of gender discrimination. In order to establish a prima facie case of gender discrimination based on circumstantial evidence, Hyde must demonstrate that she: (i) is a member of a protected class, (ii) was qualified for the Regional Manager position, (iii) suffered an adverse employment action, and (iv) was treated less favorably than a similarly situated male employees. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

If Hyde can establish a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its challenged employment action. McDonnel Douglas v. Green, 411 U.S. 792, 802 (1973). If Defendant proffers such legitimate reasons, the presumption would be rebutted and dropped from the case. Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). The burden would then shift back to

Hyde to demonstrate that Defendant's proffered reasons were pretextual. McDonnel, 411 U.S. at 806.

There is no dispute that Hyde was a member of a protected class (female), that she was qualified for the Regional Manager position, or that she suffered an adverse employment action in being terminated from her job. However, Defendant argues Hyde has failed to demonstrate she was treated less favorably than similarly situated male employees. In considering this element, it must be determined whether another employee involved in the same conduct as Hyde was disciplined in a different way. Burke-Fowler v. Orange County, Fla, 447 F.3d 1319, 1323 (11th Cir. 2006). The "quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Id. (citation omitted).

Defendant has conceded that the setup problems with the Liberty displays were not isolated to Hyde's stores. Hyde was not disciplined because the stores were not set correctly in the first place. Rather, once the problem was discovered, Hyde was disciplined for failing to react with sufficient urgency.

Defendant argues Hyde was not similarly situated to the other Regional Managers because she was warned one month ahead of time that the Home Depot and Liberty executives would be coming to her Orlando region. However, as argued by Hyde, the reset project was supposed to be handled by a separate reset crew. It was thus the reset crew, not Hyde, that was to blame for the initial problem with the resets. The relevant inquiry into Hyde's and the other Regional Managers conduct begins when the problem was discovered

in Orlando by the executives. The fact that the problem was first discovered in Hyde's stores is not relevant to the inquiry, since stores in each Regional Manager's territory suffered from the same problem.

Following discovery of the problem in the Orlando stores, all three Regional Managers (Hyde, Colbreth and Troy) were advised that the problem needed to be fixed as soon as possible. Each Regional Manager was given three days to reset their stores. Both Jaspan and Hyde immediately went to work on the Orlando stores.

Hyde argues that many of Colbeth's stores, like Hyde's, had incorrect Liberty sets. Although it took Colbeth over two weeks to complete the resets, he was neither disciplined nor terminated for missing his deadline. Instead, he was considered to have responded in a timely fashion. Hyde, the only female Regional Manager in the company, was terminated when Jaspan determined she failed to respond with an appropriate sense of urgency.

The Court acknowledges Hyde's Orlando and Jacksonville stores may have required a greater sense of urgency to reset when compared with Colbeth's (a male employee) stores, due to Hyde's stores' close proximity to the builder's show. However, all Regional Managers were given the same tasks and the same amount of time to respond to the Liberty problem. The question of whether Hyde was similarly situated to Colbeth for Title VII purposes is better left to a jury. Accordingly, the Court concludes Hyde has established a prima facie case of gender discrimination.

Hyde acknowledges that the reasons proffered for her termination, her alleged failure to respond to the Liberty situation with urgency and her negative attitude, are

nondiscriminatory in nature. However, Hyde argues that these claims were unworthy of credence and essentially a pretextual ruse designed to mask StoreLink's retaliation. Accordingly, she argues she has met her burden of overcoming the nondiscriminatory reasons proffered for her termination. See Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2106 (2000).

Hyde first directs the Court to the Affidavit of Rick Haley, a District Manager employed by Liberty Hardware. Haley, who was directly involved with the initial Liberty walk-through that uncovered the display problems, has testified that the problems were present throughout Florida and not limited to Orlando. Moreover, Haley has testified that Hyde reacted to the problem quickly, as was her custom. He claims to have been shocked when he heard Hyde had been terminated for failing to react to the Liberty problem with a sense of urgency.

Next, Hyde argues she worked well into the night to meet her deadline for the Orlando stores. Colbeth, on the other hand, was neither terminated nor disciplined for taking two weeks to reset his stores. In response to Defendant's accusations regarding the five Jacksonville stores that were not timely reset, Hyde claims that her District Manager had appropriately reset six of the eleven stores and assured her that the remaining five were also reset. Hyde was unable to walk the remaining five stores because Jaspan sent her to other stores outside her territory. Hyde had to rely on her District Managers statements that the remaining stores had been reset. Upon returning to Jacksonville and discovering the stores had not been reset, she immediately notified Jaspan and went to work to reset those

stores. Hyde has testified that the stores were reset by the March 6, 2006 deadline imposed by Jaspan.

Next, Hyde argues StoreLink's and Jaspan's claims that Jaspan had no knowledge of Hyde's complaints to HR are without merit. Jaspan acknowledges that he received and reviewed the statement Mill issued to HR. In this statement, Mills states he went to Hyde with the matter because Colbeth and Jaspan were personal friends. The statement further describes how Hyde spoke to Ward about the matter. Murphy also acknowledges that he received and reviewed Mill's statement during his conference with Childress.

As further evidence that the stated reasons for her termination were pretextual, Hyde has produced evidence that she was a highly regarded employee prior to her reporting of Jaspan's conduct. Ward and Murphy often called on Hyde to "put out fires," and even Jaspan characterized her as a good and dependable employee. DeVivo praised her reputation for completing projects and meeting deadlines, and Mill praised her as having one of the best work ethics in the company. Hyde received monthly bonuses from StoreLink up until the month she was terminated. She regularly was rated higher for compliance and project completion than both Colbeth and Troy.

Most significantly, Hyde argues that the written warnings and complaints leading to her ultimate termination were all issued by Jaspan after Hyde allegedly reported his conduct at the training seminar. While Defendant argues that StoreLink owners collectively made the decision to terminate Hyde without Jaspan's input, Hyde has produced sufficient evidence to the contrary. All written warnings were initiated by Jaspan, who discussed the

warnings with Murphy. Jaspan delivered the warnings to HR. Murphy recommended to the owners that Hyde be terminated based on Jaspan's complaints. Once the owners made the decision to terminate Hyde's employment, Jaspan was the one who fired her in the Brandon Home Depot parking lot.

Viewing this evidence and drawing all inferences in Hyde's favor, the Court concludes a reasonable juror could conclude that StoreLink's stated reasons for terminating Hyde were pretext for the actions of its management. Accordingly, Defendant's motion should be denied to the extent it seeks summary judgment on Plaintiff's claims for gender discrimination under Title VII and the FCRA.

## II.     Retaliation Claims

Under Title VII, it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter of Title VII." 42 U.S.C. §2000e-3(a). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 916, 970 (11th Cir. 2008).

A plaintiff "can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in an unlawful employment practice." Little v. United Technologies, Carrier

Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  As noted by Hyde, she need not prove that Jaspan's conduct rose to the level of sexual harassment.  Rather, she must show that she held both a subjective good faith belief that Jaspan was engaged in an unlawful employment practice, and that such belief was objectively reasonable in light of the facts.  Id.  Proof that the underlying conduct was actually unlawful is not necessary for a plaintiff to overcome a motion for summary judgment.  Id.

In the instant case, Hyde had has presented sufficient evidence that she held a good faith belief that Jaspan was sexually harassing Vittitoe.  Jaspan had reportedly been "stalking" Vittitoe.  When considering this report in combination with Jaspan's conduct at the seminar (a company sponsored event), a reasonable jury could conclude Hyde's subjective belief was objectively reasonable.

In considering if, and when, Hyde suffered an adverse employment action for purposes of her retaliation claim, the Court turns to the Eleventh Circuit's recent decision in Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008).  In Crawford, the Eleventh Circuit discussed the effect of the United States Supreme Court's decision in Burlington N. & Santa Fe Ry. Co. V. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed. 345 (2006).  As discussed in Crawford,  "[u]nder the holding of *Burlington,* the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace related."  Crawford, 529 F.3d at 973 (citing Burlington, 126 S.Ct. at 2415).  In the context of a Title VII retaliation

claim, "a materially adverse action 'means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 974 (quoting Burlington, 126 S.Ct. at 2415). The Crawford court went on to note that "*Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute an adverse employment actions." Id. at 974 n.13.

The Court must thus consider whether the written warnings Jaspan issued to Plaintiff were "materially adverse actions" under Crawford and Burlington. The threat of such a warning is more than a petty and trivial action and might deter a reasonable employee from making or pursuing a charge of sexual harassment. Accordingly, it is more appropriate for a jury to decide whether Jaspan's warnings were "materially adverse" to Hyde, and thus adverse employment actions under standard articulated in Crawford and Burlington. See id.

To prove a causal connection, the last element of Hyde's prima facie case, she need only demonstrate that "the protected activity and the adverse action were not wholly unrelated." Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (additional citations omitted). A plaintiff "satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Id.

Defendants argue that the owners of StoreLink collectively made a decision to terminate Hyde. The owners claim that Jaspan was not present, gave no input, and played

no role whatsoever in the decision to terminate Hyde. Moreover, the owners claim they were not aware Hyde had issued a written complaint regarding Jaspan's conduct at the training seminar.

Hyde has provided sufficient evidence to the contrary. All written warnings received by Hyde were issued by Jaspan. Jaspan issued the first of these written warnings approximately ten weeks after Hyde purportedly reported the conduct. Jaspan was the one who ultimately fired Hyde in the Brandon Home Depot parking lot. Moreover, regardless of what role he may or may not have played in deciding to terminate Hyde, a reasonable jury could certainly conclude Jaspan was a decision-maker in determining whether to issue her the written warnings.

Defendants argue, and Hyde has conceded, that the time period of six months between her purported reporting of Jaspan and her ultimate termination is not close enough in temporal proximity to establish a causal connection. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (holding a "three to four month disparity between the statutorily protected expression and the adverse employment action" is not close enough in temporal proximity to meet the burden of causation) . However, applying Crawford to the instant facts, the Court has concluded a jury should decide whether Jaspan's written warnings were adverse employment actions for purposes of Plaintiff's retaliation claims. See Crawford, 592 F.3d at 974. Jaspan issued the first of these warnings approximately ten weeks following Hyde's reporting of Jaspan.

Given this short time frame, combined with the fact the warnings were issued by the very supervisor she claims to have reported, a reasonable jury could conclude there was a causal connection between her reporting Jaspan and his issuance of the written warnings. See Thomas, 506 F.3d at 1363 (holding "the burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action," but noting that "mere temporal proximity, without more, must be 'very close.'"). Accordingly, Hyde has established a prima facie case of retaliation.

Once a plaintiff has established a prima facie case of retaliation, the Court must apply the same McDonnel Douglas burden shifting framework it has applied to her gender discrimination claim. The Court has already discussed the application of this framework to the instant case and need not repeat it here. As with her gender discrimination claim, Hyde has produced sufficient evidence from which a reasonable juror could conclude that StoreLink's stated reasons for terminating her were mere pretext for the actions of its management. Accordingly, Defendant's motion should be denied as to Hyde's retaliation claim.

It is therefore ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. 37) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida on December 4, 2008.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2007\07-cv-240.msj.frm